UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF NEWPORT SAND AND GRAVEL, INC., <br><br>Plaintiff,<br><br>v.<br><br>LINCOLN D. REALTY CORPORATION and HARLEYSVILLE WORCESTER INSURANCE COMPANY, SURETY,<br><br>Defendants. | Civil Action No.<br>04-40061-FDS |

## MEMORANDUM AND ORDER

**SAYLOR, J.**

Plaintiff Newport Sand and Gravel, Inc. ("Newport") commenced this action under the Miller Act, 40 U.S.C. § 270a *et seq.*, seeking to recover contractual damages from a payment bond issued by defendant Harleysville Worcester Insurance Company ("Harleysville") as surety for defendant Lincoln D. Realty Corporation ("Lincoln").[1] In 2000, Lincoln entered into a contract with the United States Postal Service to construct a post office. In accordance with the Miller Act, Lincoln furnished a payment bond to the United States in order to guarantee payment to suppliers to the construction project. *See* 40 U.S.C. § 270a(a).

Newport furnished materials to the project through a second-tier subcontract with Aztec

---

[1] The action was technically brought "in the name of the United States . . . for the use of" Newport pursuant to § 270b(b) of the Miller Act. This opinion will refer to Newport as the plaintiff. *See* 40 U.S.C. § 270b(b).

Construction Co., Inc. ("Aztec"). Although Newport fulfilled its contractual obligations, Aztec failed to pay Newport the full contract price. After unsuccessful attempts to recover the payment deficiency from Aztec, Newport brought suit against Lincoln under § 270b(a) of the Miller Act to recover against the payment bond. Pending before the Court is the defendants' motion to dismiss Newport's claim pursuant to Fed R. Civ. P. 12(b)(6) as time-barred.

## Factual Background

On September 8, 2000, Lincoln entered into a contract with the United States Postal Service to construct a United States Post Office in Clinton, Massachusetts. Pursuant to § 270a(a) of the Miller Act, Lincoln furnished a bond to the United States in order to secure payment to suppliers of material and labor to the construction project. Harleysville acted as surety for the bond.

Thereafter, Lincoln entered into a subcontract with Aztec for the provision of certain labor and materials to the project. On May 30, 2002, Aztec subcontracted with Newport. Under that subcontract, Newport agreed to provide Aztec with materials for the construction of a retaining wall at the project site.

The contract with Aztec specifically obligated Newport to "supply materials which were utilized to construct a retaining wall at the site of the Post Office." Complaint, ¶ 9. Although it is not evident from the four corners of the contract, it appears that the materials to be supplied consisted of "Redi-Wall" blocks and "5/8ths inch J-bolt[s]." *Id.* at Exhibit C.[2] "In consideration

---

[2] The contract itself does not contain a description of the materials to be furnished by Newport. Newport's invoices described the materials only as "Redi Rock Wall - Blocks." *Id.* at Exhibit D. However, a letter from Newport to Aztec dated May 1, 2003, indicates that 5/8-inch J-bolts were furnished to Aztec along with the Redi-Wall blocks. *Id.* at Exhibit C.

of Newport . . . selling [these materials] to [Aztec]," Aztec agreed to (1) pay in full for the materials within thirty days of the date of invoice, (2) pay an 18% service charge for late payments, and (3) pay all "reasonable charges," including attorneys' fees, should its account with Newport be "placed for collection." *Id.* at Exhibit B. Newport furnished all of the materials and billed Aztec for the full contract price by separate invoices dated June 15, 2002; June 30, 2002; July 15, 2002; and July 31, 2002. The exact date by which all materials were supplied is unclear, but it appears to have occurred in July 2002.

Aztec only partially paid the amounts shown on the invoices. When Newport requested payment of the balance, Aztec asserted that the retaining wall was inadequate as designed, and demanded that Newport replace the 5/8-inch bolts with 3/4-inch bolts. The record does not disclose when this exchange occurred.[3]

On May 1, 2003, in an apparent response to Aztec's concerns over the 5/8-inch bolts, Newport performed a computer-simulated crash test on the retaining wall. On the same day, Newport mailed Aztec a letter informing it that the "5/8ths inch J-Bolt does meet the required test." *Id.* at Exhibit C. The letter also requested that Aztec immediately pay $9,572.45 towards its then-outstanding principal balance and interest charges. The complaint alleges that Newport has not been paid $8,224.40 for materials and $4,176.55 in finance charges owed to it under its contract with Aztec.

By letter dated July 14, 2003, Newport notified Lincoln of its intention to assert a claim against the payment bond for the money owed to it under its subcontract with Aztec. On April

---

[3] In a facsimile transmission dated November 5, 2002, Aztec offered to meet with Newport to resolve billing issues. *Id.* at Exhibit D. The relationship between this communication and Newport's demand for payment, if any, is unclear from the record.

24, 2004, Newport filed suit under the Miller Act against Lincoln and Harleysville for $12,400.95 in contractual damages plus accruing finance charges.  Two months later, the defendants filed a motion to dismiss Newport's claim as time-barred.

**Analysis**

The purpose of the Miller Act is to "'protect persons supplying labor and materials for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings.'" *United States ex rel. GE Supply v. C&G Enterprises, Inc.*, 212 F.3d 14, 17 (1st Cir. 2000) (quoting *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216 (1957)).[4]  In furtherance of this objective, the Act requires general contractors for federal government construction project to "furnish to the United States . . . a payment bond with a surety . . . for the protection of all persons supplying labor and material" to the project.  40 U.S.C. § 270a(a)-(a)(2).  The Act affords first and second-tier subcontractors a federal cause of action to recover from the payment bond any amount owed to them for the supply of labor or materials to the construction project.  *Id.* § 270b(a); *see J.W. Bateson*, 434 U.S. at 590-591 (Miller Act precludes recovery on the payment bond by anyone whose relationship to the general contractor is more remote than a second-tier subcontractor).[5]  The Miller Act is to be liberally interpreted in order to effectuate its "highly remedial" purpose.  *See GE Supply*, 212 F.3d at 17; *United States ex rel. Water Works Supply Corp. v. George*

---

[4] The typical remedy for such non-payment is a mechanic's lien.  However, such liens cannot attach to federal government property.  *J.W. Bateson Co. v. United States ex rel. Bd. of Trustees of the Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 589 (1977).

[5] Every suit instituted pursuant to § 270b(a) must "be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed . . . ."  40 U.S.C. § 270b(b).

*Hyman Constr. Co.*, 131 F.3d 28, 31 (1st Cir. 1997).

The statute imposes two strict time conditions on a supplier's recovery against the payment bond. *See Water Works*, 131 F.3d at 31-32; *United States ex rel. John D. Ahern Co., Inc. v. J.F. White Contracting Co.*, 649 F.2d 29, 31 (1st Cir. 1981). First, the supplier must provide written notice to the general contractor of its intent to seek recovery from the bond "within ninety days from the date on which such [supplier] . . . *performed the last of the labor or furnished or supplied the last of the material* for which such claim is made . . . ." 40 U.S.C. § 270b(a) (emphasis added). Second, a lawsuit to recover from the payment bond must be instituted before "the expiration of one year after the day on which the *last labor was performed or material was supplied* by [the claimant]." *Id.* § 270b(b) (emphasis added).[6]

These conditions reflect Congress's desire to provide repose to the general contractor and the surety and to foster predictability with respect to litigation under the Miller Act. *See Interstate Mechanical Contractors*, 200 F.3d at 459. The 90-day notice requirement establishes "a firm date after which the general contractor may pay its subcontractors without fear of further liability to the . . . suppliers of those subcontractors." *Water Works*, 131 F.3d at 32. The one-year statute of limitations gives all interested parties a "a simple, fixed, and certain method for determining the period within which [a] suit [on the payment bond] must be filed." *See Interstate Mechanical Contractors*, 200 F.3d at 459.

In an effort to further these objectives, the majority of circuits that have addressed the

---

[6] Although the language is slightly different, courts have imputed an identical meaning to the concepts of "last labor performed" and "last materials supplied" in § 270b(a) and § 270b(b). *See United States ex rel. Noland Co. v. Andrews*, 406 F.2d 790, 792 (4th Cir. 1969) (§ 270b(a)); *United States ex rel. Interstate Mechanical Contractors, Inc. v. International Fidelity Insurance Co.*, 200 F.3d 456, 460 (6th Cir. 2000) (§ 270b(b)).

issue have adopted a bright-line rule for determining when the "last labor was performed" under § 270b. *See id.* at 460.[7] This rule takes a binary view, dividing contracting work into two parts: (1) work performed "as part of the original contract" and (2) "remedial or corrective work . . . or inspection of work already completed." *See id.* "Labor" under § 270b encompasses only the first category of work. *See id.* Thus, the limitations period of § 270b begins to run when the subcontractor performs the last of the work assigned to it under the original subcontract, and that period is not tolled by remedial or corrective work performed subsequent to the subcontract's completion.

It is important to note that "[l]abor furnished in the prosecution of the work is not coterminous with the outer limits of all duties provided by the contract." *General Ins. Co. of America v. United States ex. rel. Audley Moore & Son*, 409 F.2d 1326, 1327 (5th Cir. 1969). "A contractor's duties under a contract may extend, by virtue of warranty or other obligation, to a point far beyond that date when the project has been completed and the 'last of the labor was performed or material was supplied' for purposes of the Miller Act." *See Interstate Mechanical Contractors*, 200 F.3d at 461. To equate the term "labor" with "contractual obligations" would therefore frustrate the very policies of repose and predictability that Congress intended to implement through the limitations period of the Miller Act. *See id.,* 200 F.3d at 461.

Accordingly, the limitations period commences, not upon the discharge of the last contractual duty, but upon the fulfillment of the terms of the original subcontract. *United States*

---

[7] Because the parties' dispute turns on whether Newport's computer-simulated crash test on May 1, 2003, should be treated as "labor" for the purposes of the Miller Act, the remainder of this opinion will focus on the meaning of that term. However, a similar analysis and result would apply if the dispute involved what constituted the "last material supplied" under the Miller Act.

*ex rel. T.L. Wallace Constr., Inc. v. Fireman's Fund Ins. Co.*, 790 F. Supp. 680, 684 (S.D. Miss. 1992); *see Noland*, 406 F.2d at 792.  Work performed outside the scope of the original subcontract is not "labor" under § 270b and does not toll the limitations period, even if it is performed pursuant to a legal obligation or at the insistence of the other party to the subcontract. *See, e.g., Wallace Construction*, 790 F. Supp. at 684.  Two examples will suffice to illustrate the distinction.

In *Wallace Construction,* the plaintiff had subcontracted to build a drainage structure for a government construction project.  790 F. Supp. at 681.  The plaintiff built the structure and submitted its last certified payroll for the job in September 1988.  *Id.*  In November 1989, the general contractor requested that the plaintiff finalize the drainage structure by completing two "punch list" items.  *Id.* at 681-682.  The plaintiff performed these tasks, which consisted of repairing a crack and repainting stem guides, in March 1990.  It filed suit on the payment bond one year later.  *Id.* at 682.

The court held that the "punch list" work could "clearly be termed 'remedial' or 'corrective' because it entailed fixing items on a structure previously built by the plaintiff.  *Id.* at 685.  The original subcontract was completed in September 1988, the court explained, even though the drainage structure suffered from deficiencies at that time for which the plaintiff remained responsible and had not yet been "finally accepted" by the other party to the contract. *Id.*  Accordingly, the plaintiff's action was time-barred under § 270b because it was instituted more than a year after the date of the last "labor."  *Id.*; *see also Interstate Mechanical Contractors*, 200 F.3d at 461-462 (the original subcontract called for installation of heaters and one round of testing, and therefore, second and third tests of heaters did not constitute "labor"

7

and did not toll the statute of limitations).

*Noland*, in contrast, involved a plaintiff who had entered into a second-tier subcontract to furnish materials to be used in plumbing and fixture work on a government construction project. 406 F.2d at 791. After receiving notice on October 17, 1966, that the construction project – including the plaintiff's work – was complete, the government took occupancy of the premises. *Id.* at 792. However, the following January, the subcontractor in charge of plumbing and fixtures discovered that two gate valves were missing and placed an order for their delivery with the plaintiff. *Id.* The plaintiff delivered the missing valves on January 17, 1967, and provided notice to the general contractor of his intent to pursue a claim against the payment bond about one week later. *Id.*

The court held that the plaintiff's delivery of the missing valves qualified as "labor" and that his notice to the general contractor was timely because it was undisputed that "the valves were called for by both the primary contract and the subcontract." *Id.* The court rejected the defendants' theory that the government's earlier occupancy of the premises made the delivery a "mere correction or defect." *Id.* The terms of the contract are "dispositive of the issue," the court explained, "notwithstanding the Government's acceptance of the premises at an earlier date under the mistaken impression that the work had been completed." *Id.*; *see also United States ex rel. Austin v. Western Electric Co.*, 337 F.2d 568, 573 (9th Cir. 1964) (denying summary judgment on statute of limitations grounds where "many of the items on the punch list appear to be items required for the completion of the project" while others "were in the nature of corrections, repairs and cleanup").

Here, Newport furnished notice to Lincoln on July 14, 2003, and instituted the present

action on April 24, 2004.  Thus, its claim is timely only if it performed "labor" on or after April 24, 2003 (one year before the lawsuit and less than 90 days before the notice).  The only work allegedly performed by Newport within the relevant time period was the computer-simulated crash test on May 1, 2003.  Accordingly, the survival of its claim hinges on whether that test constituted work performed "as part of the original contract" with Aztec or "remedial or corrective work . . . or inspection of work already completed."

Newport's complaint alleges that the terms of its subcontract with Aztec required it to "supply materials which were utilized to construct a retaining wall." Complaint ¶ 9.  This account is consistent with the contract itself, which indicates that Aztec paid Newport "in consideration of Newport . . . selling" materials to Aztec.  *Id.* Exhibit B.  Nothing in the parties' pleadings or attached documents states or suggests that Newport was required to perform a computer-simulated crash test on the retaining wall, or to do anything other than sell Redi-Wall blocks and J-bolts "as part of its original contract."  Moreover, Newport had billed Aztec for the entire contract price by July 31, 2002, ten months before it performed the test, and demanded full payment from Aztec when it failed to pay the amounts shown on its invoices.  Although not necessarily dispositive of the issue, this conduct suggests that Newport had fulfilled the terms of the original subcontract by July 31, 2002.  *See Wallace Construction*, 790 F. Supp. at 685 (plaintiff's demand for payment on grounds that work had been complete for two years demonstrated that punch list work was remedial and not part of the original contract); *compare Noland*, 406 F.2d at 492 (party's beliefs as to when the last "labor" occurred are not dispositive where the contract clearly stated otherwise).  Accordingly, the company's test did not constitute "labor" performed "as part of the original contract" that would serve to extend the limitations

period, which began to run at some point in July 2002.

Newport attacks this conclusion from a number of directions. It asserts that its claim should survive because (1) "inspections . . . have not been held to be *per se* remedial;" (2) it "can prove a set of facts that would show that . . . [its own] inspection [was] not remedial in nature but was carried out as part of its contractual obligations"; (3) the test was performed at Aztec's request, and prior to Aztec's acceptance of the retaining wall as conforming to requirements of the subcontract; and (4) it "plead[ed] that it provided labor in the form of an inspection" during the limitations period. None of these arguments can salvage Newport's claim.

As to the first argument, Newport is correct that inspections are not *per se* remedial. *See Interstate Mechanical Contractors*, 200 F.3d at 461 (declining to hold that inspection and testing are necessarily remedial by nature). Indeed, inspections, repairs, replacements, and other work typically characterized as "corrective or remedial" could be mandated by the terms of the original contract. *See id.* However, in this instance, Newport does not allege, nor can the Court infer, that the original contract contemplated the inspection Newport performed on May 1, 2003.

Newport's second contention, that it was contractually obligated to perform the inspection, does not establish that the work was performed as part of the original contract. A party's "labor," for purposes of § 270b, is not identical to its contractual obligations. *See, e.g., id.*

Newport's third contention – that Aztec requested the test and did not accept the subcontract as complete until the test had been performed – also misses the mark. The moment of the last "labor" is determined by reference to the terms of the subcontract, not the parties' subsequent demands or their subjective views on the matter. *See Noland*, 406 F.2d at 792.

Newport's final argument wrongly assumes that the sufficiency of a claim under the Miller Act depends simply upon an allegation that "labor" was performed within the limitations period. Plaintiff's allegation to this effect is a legal conclusion that begs the question whether work was performed "as part of the original contract" within the relevant time period. Because Newport does not and cannot allege that its test was part of the original contract, it can prove no set of facts entitling it to recovery under the Miller Act.

Newport also attacks the "correction-or-repair versus original-contract" rule on public policy grounds. It contends that a strict interpretation of the rule would empower contractors to make spurious demands for remedial work in order to stretch out matters for longer than 90 days, and thus would effectively foreclose subcontractors' ability to seek relief under the Miller Act.

This concern is genuine, and the risk is real, particularly for unsophisticated subcontractors. The Court can readily envision a scenario where an unscrupulous contractor makes repeated demands on a subcontractor to remedy claimed defects, all the while providing false assurances of imminent payment, so that by the time the subcontractor realizes it will not be paid and consults a lawyer, the 90-day notice period has expired. Nonetheless, courts have uniformly taken the view that such a risk is outweighed by the benefits of a bright-line rule, which is predictable and gives parties an incentive to structure their contracts and litigation strategy accordingly. *See Interstate Mechanical Contractors*, 200 F.3d at 460. Furthermore, government subcontractors are not completely helpless; for example, they may protect their rights by insisting that the original subcontract provide for the performance of work typically classified as remedial. *See id.* at 461. In the present case, "a brief letter from the supplier to the prime contractor" within 90 days of sending the final invoice would have "made certain and unambiguous the rights

11

and liabilities of all concerned," and helped to secure Newport's right of action on the payment bond. *See Ahern*, 649 F.2d at 32 (quoting *A.B. Cooley v. Barten & Wood, Inc.*, 249 F.2d 912 (1st Cir. 1956)).

The longstanding definition of "labor" under § 270b reflects Congress's intent to foster repose and predictability in the operation of government contracts. Whatever the merits of Newport's policy argument to the contrary, it is not the province of this Court to undermine the purpose and effect of the statute.

## **Order**

For the reasons stated in the foregoing memorandum, the defendants' motion to dismiss the plaintiff's claim under Fed. R. Civ. P. 12(b)(6) is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: December 17, 2004.